1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 2:20-cr-00179-TOR-2 |
| | ) |
| Plaintiff, | ) October 31, 2024 |
| | ) Spokane, Washington |
| vs. | ) |
| | ) Pretrial Proffer Hearing |
| DANIEL AUGUSTINE SOLIS, | ) |
| | ) Pages 1 - 55 |
| Defendant. | ) |

BEFORE THE HONORABLE THOMAS O. RICE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          ALISON GREGOIRE
                            U.S. Attorney's Office
                            920 W. Riverside Avenue
                            Suite 300
                            Spokane, WA 99210-1494

                            REBECCA PEREZ
                            U.S. Attorney's Office
                            920 W. Riverside Avenue
                            Suite 300
                            Spokane, WA 99210-1494


For the Defendant:          SANDY D. BAGGETT
                            Attorney at Law
                            170 S. Lincoln, Suite 150
                            Spokane, WA 99201


Official Court Reporter:    Crystal L. Gonzalez, CRR, RPR
                            United States District Courthouse
                            P.O. Box 700
                            Spokane, Washington 99210
                            (509) 458-3434


Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

1    (Court convened on October 31, 2024, at 10:02 a.m.)

2         THE COURTROOM DEPUTY:  The matter now before the Court

3    is the *United States of America v. Daniel Augustine Solis*, Case

4    No. 2:20-cr-179-TOR-2.  This is the time set for a pretrial

5    proffer hearing.

6         Counsel, please state your presence for the Court and

7    record.

8         MS. GREGOIRE:  Good morning, your Honor.  Alison

9    Gregoire and Rebecca Perez on behalf of the United States.

10        THE COURT:  Good morning.

11        MS. BAGGETT:  Good morning, your Honor.  Sandy Baggett

12    for Mr. Solis.  Mr. Merritt had a prior scheduling conflict and

13    will not be here today.

14        THE COURT:  And good morning to both of you.

15        Ms. Baggett, I'll hear from you.  You've requested this

16    hearing.

17        MS. BAGGETT:  Yes, your Honor.

18        Your Honor, if I could proceed by calling Dr. Matthew

19    Layton, our expert witness, to the stand and engage in a

20    question and answer with him.  I think that will be the best way

21    to try to answer the Court's questions, more fully explain

22    details of his Rule 16 notice that we previously provided.  Is

23    that okay, your Honor?

24        THE COURT:  Proceed.

25        MS. BAGGETT:  Thank you.

1    Your Honor, I'm just going to apologize that I'm having to

2  use cough drops because I have a bit of a cold.

3        THE COURT:  That's fine.

4    You can come up on the witness stand, and I'll have you

5  raise your right hand and be sworn by the deputy clerk.

6    (MATTHEW LAYTON, called as a witness by the Defendant,

7      having first been duly sworn, testified under oath as

8      follows:)

9        THE COURTROOM DEPUTY:  Please state your name,

10  spelling your first and last name for the Court and record.

11        THE WITNESS:  Matthew Eric Layton, M-A-T-T-H-E-W

12  L-A-Y-T-O-N.

13        THE COURTROOM DEPUTY:  Thank you.

14        THE COURT:  Please be seated and use the microphone.

15  It's adjustable.

16        THE WITNESS:  Thank you, your Honor.

17        MS. BAGGETT:  Your Honor, I'm not going to go through

18  in great detail his credentials.  For this purpose, I'll rely on

19  his CV, his record of expert testimony, and his publications

20  that were previously filed under the Rule 16 notice, if that's

21  okay with the Court.

22        THE COURT:  Please proceed.

23        MS. BAGGETT:  Thank you.

24    ///

25    ///

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

4

1              DIRECT EXAMINATION

2  BY MS. BAGGETT:

3  Q.   Dr. Layton, I do want to just go a little bit into your

4  background to the extent that it helps us understand your

5  opinions here today.  Can you just -- so you're a psychiatrist,

6  and can you explain basically what a psychiatrist is in the

7  medical world?

8  A.   Yes.  I am a psychiatrist, and I went through medical

9  school to get an MD and then had four years of general

10 psychiatry residency training at the University of Washington in

11 Seattle.

12 Q.   And then you're also a toxicologist?  Can you explain --

13 A.   Pharmacologist.  Sorry for interrupting.

14 Q.   Pharmacologist.  Sorry.  Pharmacologist.

15 A.   I have a Ph.D. in pharmacology.

16 Q.   Yes.  Sorry.  And can you explain what a pharmacologist is

17 and why you would also get a Ph.D. in addition to being a

18 medical doctor?

19 A.   The field of pharmacology is the study of the effects of

20 medicines and substances on the body and how the body deals with

21 those substances.  And when I was in medical school and decided

22 I wanted to go into psychiatry, it was 1988, and we had very

23 little understanding of the brain and neurosciences, and so I

24 decided to get a Ph.D. in pharmacology, specifically

25 psychopharmacology, to better prepare me to take care of

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

5

1  psychiatric patients.

2  Q.   And can you explain for the Judge, what is

3  psychopharmacology?

4  A.   It's focused in specifically on the pathways within the

5  brain and the central nervous system.  The neurotransmitters and

6  the chemicals that interact specifically with different brain

7  parts, that's the psychopharmacology.

8  Q.   Can you just describe what the -- because this term may

9  come up -- what the DSM is?

10  A.   It's the Diagnostic and Statistical Manual of the American

11  Psychiatric Association, and it was originally published in the

12  1950s with what was called the DSM-1, and we are now to the

13  DSM-5 text revision.

14  Q.   And how is that publication produced?

15  A.   It is from the American Psychiatric Association, and the

16  work groups within the organization address any deficiencies or

17  problems with prior editions or incorporate new findings and

18  especially new evidence that supports the making of a

19  psychiatric diagnosis.

20  Q.   Can you describe for the Judge the materials that you

21  reviewed to prepare your opinion on the -- any evaluations that

22  you made?

23  A.   I reviewed the psychological evaluations by Drs. Low and

24  Guyton, as well as evaluations by Dr. Hail and Muscatel.  I also

25  reviewed medical records and social history records from

1  Mr. Solis, and I interviewed Mr. Solis in person at Sea-Tac back

2  in July.

3  Q.   And when you say you reviewed records of Mr. Solis, did you

4  mean the foster care records?

5  A.   Yes.

6  Q.   From his childhood?

7  A.   Yes.

8  Q.   Did you also review any medical records from jails or

9  prisons?

10 A.   Yes.

11 Q.   And did those postdate his arrest and incarceration in this

12 case?

13 A.   Yes.

14 Q.   And for the purpose of your evaluation, your opinion today,

15 sorry, did you interview anyone else?

16 A.   His biological mother, Mr. Solis' biological mother,

17 Whalen -- Ms. Whalen.

18 Q.   And the materials that you've just described, an in-person

19 evaluation of the subject, reviewing the diagnoses of other

20 psychologists and medical records, are those the typical types

21 of things that a psychiatrist, a pharmacologist would review to

22 form an opinion and diagnosis of a subject like Mr. Solis?

23 A.   Yes.

24 Q.   Can you sort of explain the difference between these two

25 terms "physiological" and "psychological"?

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

7

1  A.   Physiology -- physiology is how an organism works, all of

2  the mechanisms that make it work, for example, how blood flows,

3  how nerves work, and the basic natural state.  That is the

4  physiology.

5       The psychology is how the brain thinks about the world and

6  interprets the environment, so it is less easy to measure.  We

7  use indirect tests for psychology, as opposed to physiology

8  where you can look at things in a very mechanical way.

9  Q.   Okay.  And so for -- to kind of dumb it down for people

10 like me, physiological is like anatomy, like physical things,

11 like the anatomy of the body and chemicals, things that -- you

12 can, like -- that exist, like, physically on the body?

13 A.   Even more specifically, how the anatomy works --

14 Q.   Okay.

15 A.   -- in a functional way.

16 Q.   And for your opinion in this case, would you say it's a

17 physiological opinion or a psychological opinion or a

18 combination of both?

19 A.   It's a combination of both.

20 Q.   Can you describe for the Judge, in your report -- in your

21 notice that we had previously given, you sort of describe

22 certain neural pathways in the brain and systems like that.

23 Could you describe for the Judge those pathways that were

24 important to your opinion in this case in a normal functioning

25 brain?

1  A.   Yes.  The -- one of the main neurotransmitters of the brain

2  that a lot of lay people are familiar with is dopamine.

3  Dopamine has multiple pathways in the brain and multiple

4  different kinds of receptors in the brain from where dopamine

5  binds to have its effect.  One of the things that people say a

6  lot is they do a pleasurable activity to get a dopamine hit.

7  So, for example, eating chocolate or going for a run or the

8  kinds of things that give people natural pleasure involves

9  dopamine stimulating certain parts of the brain.

10      What we know now from the clinical side in terms of mental

11  disorders is that too much dopamine then can actually lead to

12  psychotic symptoms, including paranoia, hallucinations, and

13  delusions.  And one of the main reasons we know that is the

14  medications that block psychosis -- that help with psychosis

15  block dopamine binding in the brain.

16  Q.   And when you -- so dopamine is like a molecule, like

17  something physical in the body?

18  A.   Yes.

19  Q.   And when you say "receptors," can you describe what a

20  receptor is and where dopamine receptors that are relevant to

21  your opinion in this case -- what part of the brain would those

22  be in?

23  A.   Yes.  So a receptor is essentially a protein that is in the

24  membrane of a cell, and in this case, a neuron.  So the protein

25  is in the membrane, and the chemical binds and then triggers

1  downstream intracellular effects.  So dopamine has at least four

2  different kinds of receptors, and they're in different parts of

3  the brain.  The pleasure center or the reward center has to do

4  with the nucleus accumbens and the ventral tegmental area, but

5  then you also have projections from the cortex that go to those

6  lower brain areas.

7  Q.  When you say once the dopamine sort of combines with the

8  receptor and sticks on there, it creates a cascade of other

9  things in the cell, what kind of other things does it create in

10 the cell?

11 A.  It can turn on intracellular enzymes.  It can lead to

12 excitation or inhibition of neighboring neurons, and so when you

13 get down to the basic level, it can even activate DNA

14 transcription, for example.

15 Q.  Can you describe methamphetamine?  Is that in a class of

16 drugs and what class is that?

17 A.  The stimulants or further psychostimulants, yes.

18 Q.  What are other psychostimulants?

19 A.  Cocaine, methylphenidate, regular amphetamine, which is a

20 metabolite of methamphetamine.  You could argue that caffeine is

21 a stimulant, but it doesn't act through the dopamine pathway the

22 same way.

23 Q.  Okay.  So when a person is exposed for -- in whatever way

24 to one of these psychostimulants, what happens in that brain

25 pathway that you just described?

1  A.   The most common thing is that you get a down regulation of

2  dopamine receptors, which means that with excessive stimulation

3  due to something like methamphetamine, which is introduced to

4  the body and the brain from outside, it stimulates those

5  dopamine receptors so much that they decrease, so they get

6  pulled back into the cell.  So there are fewer dopamine

7  receptors, and that can happen regardless of how the exposure

8  takes place.

9  Q.   And what's the -- is there any significance to those

10 receptors, a reduction in the number of those receptors?

11 A.   The individual often will try to increase stimulation by

12 taking more of the substance or if they're not in a place to do

13 that, they may have deficits that lead to things like problems

14 thinking, difficulty with sleep, and natural function.

15 Q.   What -- is there any effect on these brain cells and

16 receptors when there is longer-term exposure to one of these

17 kinds of stimulants?

18 A.   Yes.  You can go from acute effects to more chronic

19 effects.

20 Q.   And when you say "more chronic effects," what in the brain

21 do you mean by that?

22 A.   The brain gets more and more dysregulated, especially the

23 more it's exposed to higher amounts of whatever the substance

24 is.  And therefore, for example, you no longer get a high

25 feeling because you're consuming so much, it tends to be more of

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

11

1  an anxious state or more of a dysphoric state and often leads to

2  staying up for many days to try to achieve some sort of good

3  feeling, but most the time, the chronic state is trying to

4  maintain and not actually feeling the same kind of euphoria as

5  acute.

6  Q.   Okay.  So you've used the terms "chronic" and "acute."  Can

7  you just explain for the Judge sort of the spectrum of I guess

8  timeline of diseases in that term -- in those terms?

9  A.   If, for example, there was exposure in utero, so while his

10  mother was pregnant, to any substance, it can affect the brain

11  well before the human being has any choice about that.  So if,

12  for example, you look at fetal alcohol syndrome or fetal alcohol

13  effect, it's because the baby's brain is exposed to alcohol

14  while the mother is pregnant, and it changes the brain structure

15  and function.  It's a similar kind of effect with crack.  For

16  example, we talked about crack babies a lot back in the '80s.

17  When the baby is exposed very early, their brain is super

18  sensitive to those impacts on their dopamine pathways.

19  Q.   And why is it that -- so how long -- so there's -- why is

20  it that babies are more sensitive -- why are their brains more

21  sensitive on those dopamine pathways?

22  A.   They're so undeveloped, and the amounts of the chemical

23  that are being exposes to this very small being, small human

24  being, versus a full grown person, you have effects both on the

25  periphery as well as in the brain.  And if that exposure

1  continues over time, then the infant has very little ways to

2  address that.  They need nurturing.  They need food.  They need

3  care.  And that's what they're supposed to be getting that will

4  stimulate the brain.  Nutrition, they need nutrition.  That's

5  what's supposed to stimulate the brain to develop normally, but

6  when they're exposed to substances early on, their brain doesn't

7  get that chance to develop normally, and also are not getting

8  the nurturing and the nutrition, the sleep, the other things

9  that they need.

10 Q.  So if that's sort of the state of -- at like infants, how

11 long in the lifecycle would you say that these pathways develop

12 in a human until they're sort of mature?

13 A.  We used to think it was 18 years of age, but it's closer

14 probably to 25, how long the brain actually takes to develop,

15 and that's based on a lot of neuroscience that came out of the

16 '90s.

17 Q.  And in addition to sort of this heightened sensitivity for

18 very young infants, is there any other phase in life where

19 something like this would also be more heightened sensitivity?

20 A.  Yes.  The transition through puberty, you either are

21 exposed, no matter what gender, or you have hormones that

22 drastically affect your development, your body, from the basic

23 things we all think about in terms of sexual maturation, but we

24 also know there are gender differences in the brain and that

25 testosterone and estrogen and those chemicals during puberty

1  have a serious impact.  So if somebody has already had their

2  brain altered and not be able to develop properly up to that

3  point, when you then hit puberty and all these other hormones

4  start pumping, a lot of times it's very unpredictable, but we

5  see are increased rates of mood problems in adolescence, as well

6  as early substance use.

7  Q.   Can you -- what is neurotoxicity?

8  A.   It's essentially an overstimulation of a neuron to the

9  point where it's damaged or even potentially ruptured and dies.

10 Q.   And does that happen with these kind of psychostimulant

11 substances?

12 A.   With enough of the psychostimulant, but the argument really

13 is around how methamphetamine, for example, is made.  There are

14 a lot of contaminants that go along with it that can also harm

15 the brain, but even just with overstimulation of the neurons,

16 you can get brain damage.

17 Q.   And by that, you mean like physiological brain damage?

18 A.   Yes.

19 Q.   Like actual tissue?

20 A.   Losses of normal cells, decreased connectivity of the

21 neurons.

22 Q.   Can you define sort of acute and chronic and end stage in

23 terms of in terms of methamphetamine?

24 A.   The typical course, if you have someone who has had a

25 chance to mature normally, the acute exposure to methamphetamine

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

14

1  is when they do feel high, they feel euphoria.  They feel

2  special abilities a lot of times.  And the reason they feel that

3  is they get a significant increase in dopamine, and it's the

4  delta from baseline to the new dopamine that creates that high.

5       As they move from subacute into chronic use, the delta gets

6  less and less, and the person is trying to stimulate those same

7  areas, but they're not getting the same response.  So that's

8  tolerance.

9       And then when you get to the end stage where you start to

10  have brain damage or your body is totally dependent on it, you

11  have withdrawal.

12       And then, in terms of methamphetamine, often the disruption

13  in the dopamine and then the loss of sleep chronically can lead

14  to the paranoid delusions, hallucinations, and then full on

15  psychotic symptoms, like messages from the TV and the radio

16  telling them to do things.

17  Q.   Okay.  You sort of talked about psychotic state or

18  psychosis.  Can you define for the Judge what you mean by that?

19  A.   It's a state, regardless of what causes it, where the

20  individual does experience perceptual distortions or beliefs

21  that other people don't share.  We call it a break from reality

22  because the ideas are bizarre, and they don't conform to what

23  most people around this person thinks is real.  They believe

24  their reality, and you can't talk somebody out of a delusion.

25  That is really psychosis at that point, and that can happen from

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

15

1  mental disorders like schizophrenia or bipolar disorder with

2  mania and psychosis or from severe substance use.

3  Q.   So a person who is experiencing psychosis, do they have any

4  self-awareness that they are having -- or that they're having

5  these delusions?

6  A.   Very little, especially when it begins in the teen years.

7  They often are completely out of touch with reality and don't

8  understand how bizarre the things that they're saying are.

9  Q.   And is there some sort of either physiological or

10 psychological reason why they don't realize that their way of

11 thinking is not normal?

12 A.   It's because of the brain pathways that are affected.  For

13 example, the prefrontal cortex has a role in discriminating

14 what's real from what's not, and also insight into one's own

15 situation is a more of a cortical process.  And when you've

16 overstimulated the midbrain with too much dopamine, it's as

17 though the cortex is not able to control that any longer, and

18 now the person is fully consumed and doesn't understand that

19 what they're saying doesn't match up with what everybody around

20 them believes.

21 Q.   Is there a medical term for that or psychological term for

22 that?

23 A.   It's just usually psychotic disorder due to whatever is

24 causing it.

25 Q.   You just mentioned that this sort of process with

1  methamphetamine exposure is like schizophrenia.  Can you

2  describe for the Judge what you mean by that?

3  A.   The same pathways are overactive in the brain, and the same

4  medications are used regardless of whether the psychosis is in

5  the context of schizophrenia or bipolar mania or

6  methamphetamine.  So right now, one of the main reasons people

7  get admitted into a psychiatric hospital involuntarily is

8  because of methamphetamine psychosis.  The hope is that will

9  wear off, but in the meantime, you treat them with the same

10 antipsychotics that you would treat someone who has

11 schizophrenia.

12 Q.   And so when you say schizophrenia involves the exact same

13 pathways as this methamphetamine, do you mean like

14 physiologically, they are the same process?

15 A.   Yes.  There's evidence, for example, from neuroimaging

16 where parts of their brain are affected.

17 Q.   And so the only difference between schizophrenia and some

18 kind of chronic methamphetamine psychosis is the origin of the

19 problem?

20 A.   I think that's fair to say, yes.

21 Q.   Can you describe the -- as you understand it from the

22 sources that you've talked about, from the foster care records,

23 from speaking to Mr. Solis, from various different medical and

24 psychological evaluations that have been done, both by defense

25 doctors and government psychologists, your understanding of the

 1  relevant medical history of Mr. Solis?

 2  A.    What I found is that the reports were remarkably consistent

 3  in finding that he was psychotic at that point.

 4  Q.    And "at that point," when do you mean?

 5  A.    At that point, meaning around the time of the events, and

 6  would have been just -- according to his mother, really August

 7  through December of 2020.

 8  Q.    2019?

 9  A.    2019.  Sorry.  And during that time, according to her

10  report, contemporaneous reports, she would talk to him on the

11  phone, and he was terrified, and he was disorganized.  He had no

12  means to support himself, but needed to -- felt like he was

13  running away.  So he was paranoid.  He was delusional.  And all

14  those things are consistent with psychosis.

15      And then the retrospective interview asking him to look

16  back on those symptoms many years later, he was able to describe

17  them and had a story that was remarkably consistent when it came

18  to the substance use, when it came to his childhood, when it

19  came to his life experiences that led up to this time.

20  Q.    And can you describe, when you say "his childhood," can you

21  describe what you understand of his childhood from the

22  interviews and from the foster care records?

23  A.    Yes.  According to his biological mother, she is hesitant

24  to talk about some of these things, but she made it very clear

25  by saying that methamphetamine was everywhere in the house where

1  he was a child, a small child, that there was active use going

2  on almost constantly, to the point where for some reason he had

3  at least one seizure.  He was taken for emergency care and

4  placed on an anticonvulsive medication for a month.

5       One of the things that his mother said is that, at that

6  time, they were using methamphetamine and also playing video

7  games for hours, upon hours, upon hours.  And so as a five or

8  six-year-old, he was in that environment and affected by most

9  likely getting exposed to the methamphetamine and then also

10 being exposed to the environment.

11      Then, when he was taken from that environment and placed in

12 foster care, evaluated at Community Mental Health Centers, he

13 was found to have attention deficit hyperactivity disorder, as

14 well as post-traumatic stress disorder, and behavioral problems.

15 Q.   Okay.  So when you say that when he was a very small child,

16 there's indication from his mother that there was -- she was

17 actively using methamphetamine in the home everywhere all the

18 time, was that also confirmed by the foster care records?

19 A.   From what I could see, yes.

20 Q.   And what was -- he was removed from her custody?

21 A.   Yes.

22 Q.   Why?

23 A.   Neglect was certainly his mother's report.  But from what

24 he described, my guess is the environment was unfit.  If they

25 did a site visit, for example, if a social worker went to that

1  environment and those activities were going on, that would be a

2  reason to remove.

3  Q.   And so you said that, once he was removed from the home and

4  placed into foster care, he was diagnosed with ADHD.  Was he

5  treated for that?

6  A.   Eventually, he was treated for that, yes.

7  Q.   What was the treatment for that?

8  A.   A psychostimulant.  So one of the most common treatments

9  for ADHD is mixed amphetamines, such as Adderall, which is the

10  trade name.

11  Q.   And so once he was removed from the environment of his

12  mother, he was then prescribed amphetamine?

13  A.   Correct.

14  Q.   In your opinion, based on the discussion we had earlier

15  about the periods of sensitivity of the brain, what would be

16  both the exposure in his mother's home and then prescription,

17  amphetamine, what would that have, in your opinion, done to his

18  brain during this time period?

19  A.   One of the things that we don't understand fully is how

20  ADHD, for short, occurs, but what we do know is that the

21  treatment for it involves stimulants, not always amphetamines,

22  but also methylphenidate, Ritalin.  These are all stimulants,

23  and it focuses the attention and calms down the behavior in a

24  child, which is the opposite of what you would expect from a

25  psychostimulant.

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

20

1   The brain, in the case of previous exposure, your dopamine

2   pathways have already been altered.  Now, if you are replacing

3   or using a medication in controlled, regular amounts, as opposed

4   to using a stimulant all day long all night for a long time,

5   then you can get a balance back of having enough of a stimulant

6   to function without leading to dysfunction, such as happens with

7   addiction.

8   Q.   So, in your opinion, was his exposure in his -- did the

9   exposure to methamphetamine in his mother's home affect his

10  brain pathway as a very young child, this dopamine sort of

11  receptor pathway that we've been talking about?

12  A.   Yes.

13  Q.   And what would have been the effect of that on his brain?

14  A.    In addition to changing the dopamine receptor numbers and

15  distribution, it also may have led to poor nutrition.  For

16  example, one of the things about stimulants is they can decrease

17  appetite.  So at a key time where he needed adequate nutrition

18  for his brain to develop properly, I don't believe that he was

19  getting it.  And so the effect of the environment on his brain

20  development includes a methamphetamine exposure, but then also

21  the neglect and other things that went along with it.

22  Q.   And so when he was given prescription amphetamine, would

23  that have played into damage that he already had in his brain or

24  would it have helped damage in his brain?  What would have been

25  the effect of that?

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

21

1  A.   The hope is that it would help balance the

2  neurotransmission so that if he has a downregulation of dopamine

3  receptors, you're replacing that with a prescription of

4  amphetamine, and on a regular and consistent basis.  Then that

5  balance would hopefully allow him to do things like attend

6  school, do homework, attend counseling sessions, and that was

7  what happened for several years.

8  Q.   Right.  And so from the foster care records, did you see

9  that while he was on prescription amphetamine, there was some

10 balance in his life?

11 A.   There were improvement in his behaviors, yes.

12 Q.   And so what does that tell you about the damage that had

13 been done to his brain that such regular doses of amphetamines

14 sort of regularized his behavior?

15 A.   Yeah.  That is more consistent with the current treatment

16 of ADHD, and that's one of the questions is, if you have a child

17 with ADHD, they don't grow out of it.  And so if they're going

18 to stay on medications for many years to help the ADHD, you have

19 to have it at a right dose and a right frequency so that it

20 doesn't knock things out of balance again.

21 Q.   And that's because, as you describe, they have fewer of

22 these receptors or these receptors have retreated -- these

23 dopamine receptors have retreated into the cells, and they're

24 just not available?

25 A.   And the whole brain has been sensitized.

1  Q.   And when you say the "brain has been sensitized," what do

2  you mean by that?

3  A.   The exposure to a developing brain has multiple effects.

4  I'm only talking about the dopamine system because it's

5  understandable and directly relates to psychosis.  But, in

6  effect, it's -- all of the things that we just talked about lead

7  to an abnormally-functioning brain.  In addition to the dopamine

8  receptors, it's the downstream effect on other neurons, so it's

9  a network that's affected.

10 Q.   And did he -- in his childhood, did the foster care records

11 indicate that he continued getting prescription amphetamines?

12 A.   I don't remember when exactly that stopped, but when he

13 went back -- when he went to the custody of his grandmother, and

14 according to his biological mother, they felt like he was on

15 medications that he did not need, and so he was taken off of

16 them at that time, so.

17 Q.   Approximately what age was that?

18 A.   I think 12, so right around there, 12 or 13.

19 Q.   Okay.  And so you had previously talked about how this

20 puberty age was another highly sensitive time for brain

21 development.  What would have been the effect of removing him

22 from prescription amphetamines at that time?

23 A.   It could have been significant because his brain may have

24 found some balance over those few years.  His behavior was

25 reflecting that he was improving, and not only taking away the

1   medication because now you have changed the receptor profile to

2   a different balanced state, but you're also -- they also took

3   away the structured living environment that he had that provided

4   routine.  It helped him to have accountability in that

5   environment.

6       So it was the taking away the medications, but then also

7   going back into the family environment where the treatment, from

8   everything that I could look at and talked with Ms. Whalen about

9   was they did not prioritize his treatment for his diagnosed

10  mental disorders at all.  So that's when he turned to drinking

11  alcohol and then marijuana and then stimulants.

12  Q.   And when you say he turned to these substances, why -- is

13  there sort of a physiological reason why he would have turned to

14  these substances?

15  A.   I can say that there's a correlation between ADHD and

16  substance use in adolescents, especially if it's untreated.

17  Q.   And so his -- what about -- his exposure to methamphetamine

18  and amphetamine, the sort of rewiring of his brain, would that

19  have led to his seeking out these kinds of substances?

20  A.   It increases the risk.  In addition, the post-traumatic

21  stress disorder increases the risk of, for example, alcohol use,

22  substance use, and so you have combined ADHD and PTSD, and both

23  of those are known for, if they're untreated, the individual

24  will turn to substances.

25  Q.   Okay.  And is that sort of just what we would just call

1  addiction?

2  A.   Well, if -- the addiction part of it, to me, is if you had

3  had a normal upbringing, normal development, normal trajectory,

4  and you are now 19 years old and you use methamphetamine and you

5  get high and you then develop a pattern of use, then the current

6  definition is that it has to be use for at least 12 months in

7  order to be a substance use disorder.  So if a 19 or 20-year-old

8  who had no prior history of mental disorders, no prior history

9  of neglect or abuse, started making that a part of their lives

10  on a regular basis, then they would start changing their brain

11  chemistry in a way that it can start to crave that stimulant.

12      So in the regular addiction world where if that is the

13  case, they can still progress through acute to chronic to end

14  stage, and they still can become methamphetamine -- they can

15  still get psychosis from methamphetamine, even if they weren't

16  exposed earlier in life, but it's a different situation when you

17  know that these exposures happened, you know that brain has been

18  sensitized.  So it's a little bit different from addiction in my

19  view because inside the -- in utero or as a smile child, you

20  have no choice, and you're being exposed to this.

21  Q.   And I think you've described that as sort of stimulant

22  dependency of the brain.  Can you just explain what that means?

23  A.   Yes.  In the diagnostic manual, the DSM-IV, we use terms

24  "substance abuse" and "substance dependence," and they were

25  confusing because people also talked about addiction.  And so

1  what the DSM-5 has done is said any of these are considered a

2  substance use disorder.  So it could be alcohol use disorder.

3  It could be cannabis use disorder, opioid use disorder, and then

4  you have mild, moderate, or severe.  And then, as you get over

5  time and you have a physiological dependence, that's when you

6  get tolerance and withdrawal.  So we still can use the term

7  "physiological dependence" because the body mechanically is

8  dependent on it, but we don't use it in the psychological term.

9  We call it a use disorder.

10  Q.   Okay.  But so, in your opinion, Mr. Solis's situation is

11  different from sort of the normal, like, addiction kind of

12  scenario that you described for what reason?  Why is this

13  different?

14  A.   Because I believe his brain chemistry and the imbalance

15  that resulted from early life exposure led to, when he was not

16  being treated for his mental disorders as an adolescent, he was

17  trying to feel better.  He was trying to find something that his

18  brain was craving.  What ended up happening later on is that use

19  continued in a way where, when it became chronic, he became

20  psychotic, and then his judgment was impaired.  He had lack of

21  insight into what was going on, and he had a break from reality.

22  Q.   And you've previously described in your report that, at

23  that point, sort of once he reached this psychosis stage, which

24  may have been longer, but certainly covered the period from

25  August 2019 through his arrest in February 2020 -- I just lost

1  my train of thought -- his use at that point of methamphetamine

2  was involuntary.  Can you describe to the Judge why you say

3  that?

4  A.   The current thinking within the National Institute on Drug

5  Abuse -- and there is a very succinct video by Dr. Nora Volkow,

6  who is the director of the National Institute on Drug Abuse, and

7  what she describes is the reward system getting out of control,

8  such that the cortex or the rational thinking part of the brain

9  can no longer put the brakes on, and so she talks about it in

10 terms of loss of free will.  We talk about it in the clinical

11 context in psychiatry as the loss of cognitive and volitional

12 control, and that was in that state of psychosis.

13 Q.   And can you just describe for the Judge who she is and what

14 her research covers?

15 A.   Yes.  She is a neuroscientist.  She's the leading expert in

16 the United States on substance use and addiction.

17 Q.   And does her, like, scientific research involve this sort

18 of this cortex and loss of function?

19 A.   Yes.  And that is important because, in the '80s, we didn't

20 have all of this evidence, scientific evidence, from the decade

21 of the brain, which is the 1990s.

22 Q.   Yeah.

23 A.   So she oversaw NIDA during the time where they took a lot

24 of those findings from animal research, for example, and applied

25 it to humans.

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

27

1  Q.   Okay.  So let's switch gears for a second.

2       What was medical science's understanding of stimulants and

3  addiction let's say in the 1980s, in particular the early 1980s?

4  A.   It was a very black and white way of approaching it and

5  thinking that, for example, Alcoholics Anonymous is a very good

6  example where what they say is if you have an alcohol use

7  disorder, back then it would have been called you know alcohol

8  dependence or alcohol abuse.  Then one of the first tenants that

9  they had was that you had to say your life had become

10  unmanageable and you no longer had control, so you had to give

11  it up to a higher power.  So at that stage, when people had

12  problems with alcohol, they were referred to an abstinence

13  model, which essentially said either you are always an

14  alcoholic, you are always dependent, and so they introduced

15  themselves as I'm so-and-so, with my name, I'm an alcoholic.

16  That, in the field of psychiatry, was really the only treatment

17  for substance use disorder at that time was abstinence.

18       When we started learning more about harm reduction and the

19  ability to treat substance use disorder with medications, we

20  tried to reduce the impact and tried to acknowledge that there's

21  a gray zone there that abstinence only works for some people but

22  not for everybody.  And so we've learned more about trying to

23  address the underlying brain mechanisms.

24  Q.   So would you say, in the 1980s, this idea of addiction and

25  substance abuse was thought to be, by the medical field, a power

1  of the, like, will, like just a question of willpower?

2  A.   Yes and considered a behavior.

3  Q.   Right.  Was there any understanding that it was actually

4  biologically-based, that it had components in the brain,

5  networks, the kinds of things that you've been talking about

6  today?

7  A.   The closest thing -- way to answer that is fetal alcohol

8  syndrome has been around for a long time, fetal alcohol effect.

9  And so people have known that if a pregnant mother drinks

10  heavily, it will impact the infant.  So that was the beginning

11  of the neurobiological basis because that infant would not be

12  considered born addicted.  Right?  People will say that, but the

13  point is they -- there was no choice, and their brain was

14  altered from that time.  But we do understand much more about

15  that now than we did then.

16  Q.   Can you explain -- you mentioned the 1990s.  What happened

17  in the 1990s to sort of change the understanding that it's brain

18  pathways?

19  A.   It was actually labeled "The Decade of the Brain" by the

20  scientific community, and there were billions -- I'm not sure

21  how much went into that.  But actually the funding for the

22  National Institutes of Health increased, and in particular, we

23  now have the National Institute on Drug Abuse, we have the

24  National Institute on Alcoholism as well, which is a separate

25  institute, and then we also have the National Cancer Institute,

1  which does a lot of work around nicotine or tobacco addiction,

2  right, or substance use disorder.

3      So all of that infrastructure and all that spending led to

4  findings all over the country at universities around how these

5  substances affect rodents and then primates, and then eventually

6  those findings were applied when we had imaging like magnetic

7  resonance and PET scans, we started to study the effects in

8  humans themselves and saw the impact.

9  Q.   Okay.  And what kind of -- describe what those scans are

10 that you just mentioned?

11 A.   It's -- for example, an MRI, a lot of people think of as

12 you go into a big magnet and you try to hold still, and all

13 these sounds are happening, and what's going on is you're using

14 technology to develop a picture of the brain that is actually a

15 3D picture.  But then we also have functional imaging, which

16 shows changes over time.  So it's not just a snapshot.  It's

17 more like a video.

18     Then a PET scan is where you actually put a radioactive

19 isotope into your bloodstream, and it goes to the brain, and you

20 have a scanner that picks up the radiation, and you can see

21 functional changes within the brain that way over time.

22 Q.   And so, you know, between now and let's say 1983, what --

23 how would you describe the change in the understanding,

24 particularly in a case like this, where there's exposure as a

25 young child from the 1980s?

1  A.    Mm-hmm.  The term now, and I'll quote Dr. Volkow, is the

2  brain has been hijacked, and that that loss of free will, which

3  she describes, or the loss of willpower to make the healthier

4  choice, and now you're doing an automatic behavior where you

5  just continue it without thought, that's the loss of cognitive

6  and volitional control that we equate to loss of free will.

7  Q.    In your review of materials related to the case, you know,

8  sort of evidence, text messaging, videos, and things like that,

9  what kind of evidence did you see that made you believe that

10 that was the state that Mr. Solis was in that -- the psychotic

11 state where he had no free will?

12 A.    One of the most important things for me was a conversation

13 with his mother because she was relaying information from that

14 time.  In my interview with him and with the others' interviews,

15 they were all, as I said, consistent in finding that he did have

16 psychosis.  It's still retrospective.  And so that's why knowing

17 that at that time he was saying these bizarre things, he was

18 acting strangely, for her to say this was very out of character

19 for him, he had never acted like this before, all of those kinds

20 of things, in addition to the just overwhelming number of texts

21 and the -- it's stalking in the extreme, the control,

22 preoccupation, that was his whole world was that psychosis and

23 his delusions and hallucinations.

24 Q.    So when you say the stalking conduct, do you mean stalking

25 his codefendant?

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Direct by Defense*

1  A.    Yeah.

2  Q.    And the paranoia, what -- paranoia of her you mean?

3  A.    Zero trust at all and that, from the post-traumatic stress

4  disorder, is certainly -- part of PTSD is not trusting.  But

5  then also having had this prior relationship just before that

6  and now being in a situation of thinking that she's doing bad

7  things -- I'm talking about the events -- his whole life

8  involved using methamphetamine and trying to effect this

9  outcome, trying to follow the delusions that he had.  So it was

10 his whole preoccupation at that point.

11 Q.    And what about, you know, it's kind of all over the record

12 that, at that time, he believed he was Jesus, that he was trying

13 to be inducted into the illuminati, these kinds of things.  Is

14 that, for you, an indicator also of this psychosis, this loss of

15 sort of frontal cortex control?

16 A.    Yes.  These are very classic delusions.

17 Hyper-religiousness, believing you're the higher power, those

18 are classic for bipolar mania, as well as schizophrenia.

19       MS. BAGGETT:  Your Honor, I think that's the only

20 questions I have.  Do you have questions that we can follow up

21 with as well?

22       THE COURT:  No.

23    Ms. Gregoire, cross-examination?

24       MS. GREGOIRE:  Thank you.

25    ///

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Cross by Plaintiff*

32

CROSS-EXAMINATION

1

2  BY MS. GREGOIRE:

3  Q.   Good morning, Dr. Layton.

4  A.   Good morning.

5  Q.   I wanted to start just to get sort of a baseline.  You

6  talked somewhat extensively about your interview with

7  defendant's mother, Ms. Whalen.  In fact, I think you said that

8  was one of the most important things.  That did not make your

9  report, correct?

10  A.   That was afterwards, yes.

11  Q.   Okay.  When was that?

12  A.   May I check my notes in my --

13  Q.   Yes.  Absolutely.

14  A.   October 15th.

15  Q.   Okay.  Of this year?

16  A.   Of this year, yes.

17  Q.   Okay.  And I guess when you interviewed Ms. Whalen, I

18  assume that was a telephonic interview; is that correct?

19  A.   Yes.

20  Q.   And what did she tell you that you found informative?  What

21  did she tell you about Mr. Solis?

22  A.   Primarily that he was very scared, that he was confused,

23  that he was acting bizarre.

24  Q.   And did she give a timeframe for that?

25  A.   Yes.  August through November really was the time that she

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Cross by Plaintiff*

33

1   was focused on of 2019.

2   Q.   Okay.  Of 2019?

3   A.   Yes.

4   Q.   Okay.  And how was it that she was able to observe him as

5   scared, confused, acting bizarre?

6   A.   He called her repeatedly.

7   Q.   Okay.  Because he did not live with her at that time; is

8   that correct?

9   A.   Correct.

10  Q.   Okay.  So she observed these things via phone calls?

11  A.   Yes.

12  Q.   Okay.  And then she talked to you about his childhood and

13  meth exposure to him during his childhood?

14  A.   Yes.

15  Q.   That's my understanding.  Okay.

16       And she said to you, "Meth was everywhere"?

17  A.   That was a quote, yes.

18  Q.   Okay.  Did you confront her with all of her statements to

19  CPS and other investigations conducted by CPS that suggest meth

20  was not everywhere?

21  A.   Did I confront her with that?

22  Q.   Yes.

23  A.   No, I did not.

24  Q.   Did you note that that was a wild discrepancy from what was

25  described in those records?

1  A.    No.   I'm not sure exactly -- do I -- could you repeat the

2  question?

3  Q.    In the records, it's your understanding the children were

4  taken away because the mom was being neglectful and was also

5  under the influence of methamphetamine, correct?

6  A.    Yes.   That is my understanding.

7  Q.    And at that point, when she was spoken to, she said she

8  didn't have a problem, used it recreationally, could stop

9  whenever she wanted, correct?

10  A.    When she -- back then?

11  Q.    Yes.

12  A.    You're talking about -- yes.

13  Q.    And she did in fact stop using methamphetamine as indicated

14  by her years of clean drug tests, correct?

15  A.    Intermittently.

16  Q.    Well, she went back to meth, I believe she says, one time.

17  Did you see something else in there that I did not see?

18  A.    The way she phrased it to me was, "I'm an addict.   It

19  almost killed me," and that he -- people who were doing it in

20  the home -- "people were doing it in the home.   It was

21  everywhere."   She said that she was taken -- he was taken away

22  because she was "neglecting my kids," and she described him

23  growing up in that environment with the people who were using

24  methamphetamine.

25  Q.    Okay.   And who were the people?

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Cross by Plaintiff*

35

1  A.   Not by name.  I didn't ask any specific names.

2  Q.   Okay.  But you know from the records that she at one point

3  lived with a boyfriend when the children were there, and that's

4  the only person she's described as living with; is that correct?

5  A.   I don't know that for sure.

6  Q.   Okay.  And then she described using methamphetamine when

7  she was pregnant with the defendant?

8  A.   She did not admit that.

9  Q.   Okay.  Where did you see that?

10 A.   I -- what she said was that, when she was pregnant with

11 him, that methamphetamine was still in the environment.

12 Q.   Okay.  So it was -- she may have ingested it secondhand at

13 some point that she was pregnant with him; is that correct?

14 A.   My statement is that it was in the environment when she was

15 pregnant and early in his life.

16 Q.   Okay.  And you understand that defendant was removed from

17 her care at about age five; is that right?

18 A.   Yes.

19 Q.   Okay.  I think I'm clear on that.  I want to go -- take a

20 step back and go to some more general discussion points again

21 just to establish a baseline.

22      What is your definition of voluntary as opposed to

23 involuntary intoxication?  You said defendant's intoxication was

24 involuntary.  I'm asking as a general matter, not speaking to

25 defendant, when you, as a doctor, are looking at this, what do

1  you determine -- use as a definition for this is involuntary,

2  this is voluntary?

3  A.   We don't technically define it that way.  I think that's a

4  question of language.  So, for example, if I found that someone

5  had a substance-induced psychotic disorder, what I'm concerned

6  with is:  What is the substance and what is the severity and

7  what is the chronicity?  And so when we talk about voluntary

8  versus involuntary, it's more in the way of treatment.

9  Q.   Okay.  How do you define "addiction"?

10  A.   Use of substances in the face of negative consequences,

11  usually involving compulsive use, which means that, like I said,

12  you have to have a 12-month pattern that's clinically

13  significant and causes duress.  It has to interfere with

14  relationships, interfere with work or school, interfere with

15  parenting.  That's how you make the diagnosis, and then there

16  are 11 different criteria for determining the severity of

17  addiction, which technically would be a use disorder.

18  Q.   And some of those adverse consequences that you indicated

19  that accompany addiction, right, use of a substance in the face

20  of negative consequences, and some of those adverse consequences

21  are psychological, correct?

22  A.   Yes.

23  Q.   And some of those consequences are physiological, correct?

24  A.   Yes.

25  Q.   I want to talk a little bit about defendant's childhood,

1  but it's my understanding as sort of an overarching theme that

2  because defendant had methamphetamine around him up through the

3  age of five when he was taken away from his mother and because

4  he was prescribed Adderall, which we assume he used, he was more

5  susceptible to methamphetamine addiction; is that right?

6  A.   Can you rephrase that?

7  Q.   I don't know that I can.

8        In terms of why it's relevant that he had methamphetamine

9  around him when he was little, why it's relevant that he was

10 using Adderall and then came off of Adderall in his sort of

11 mid-teen years, preteen years, that is relevant because it made

12 him more susceptible to the meth that he used, the elicit

13 methamphetamine that he used later, correct?

14 A.   Yes.

15 Q.   Okay.  I wanted to talk a little bit about his childhood.

16 I guess I want to talk first about just the Adderall.  Having

17 reviewed those records -- and you reviewed the records from

18 California, correct?

19 A.   Yes.

20 Q.   Defendant told you during his interview with you that he

21 was on a cocktail of medications, he was taking a handful of

22 medications every day from ages five to 13, right?  That's what

23 he told you?

24 A.   Yes.

25 Q.   And that's not true, is it?

1  A.   I would have to have those records in front of me to see.

2  His mother also said he was on five medications, and so I think

3  that's important.

4  Q.   But he wasn't living with his mother during that timeframe,

5  correct?

6  A.   Correct.

7  Q.   And the records reflect that he was prescribed Prozac,

8  correct?

9  A.   Yes.

10 Q.   And the records reflect that he was recommended for

11 Adderall in about 2004, and he may have ultimately taken it, but

12 then in 2005, he agrees to a clinical trial of Adderall, so we

13 know that he is then going to take it because he agreed to it,

14 right?  And then it's listed on his medications for a year, and

15 then in 2007, it listed him as only being prescribed Prozac;

16 isn't that right?

17 A.   I would have to look again.

18 Q.   Is it -- does it make a difference to your analysis if he

19 was only using Adderall for about a year or would that not

20 impact?

21 A.   It would make a difference because if his brain was

22 sensitized and Adderall actually helped with the balance of

23 dopamine and that were taken away, then he might be seeking out

24 something to regain that balance.

25 Q.   And so if it was taken away, it would have been taken away

1  by 2007 because that's when it lists only Prozac, correct?

2  A.   There were -- I would have to have the records in front of

3  me because there were multiple evaluations by different people.

4  Some were prescribing medications; some were not.  And so, to

5  me, just like the example with his mother, the reason she told

6  me he was on five medications is she and her mother took him off

7  of those when he was taken out of foster care.

8  Q.   And he was taken out of foster care to your understanding

9  in 2008 on June 19th?

10  A.   I would have to check.

11  Q.   Okay.

12  A.   If you are telling me that's what it's -- that would make

13  sense.

14  Q.   And at that point, she had him on no medications, per your

15  interview with her?

16  A.   Correct.

17  Q.   Okay.  And then he had also mentioned to you that he was on

18  Abilify at one point, and that's not true, correct?  He was

19  never on any antipsychotic medication while he was in foster

20  care?

21  A.   In jail, right.

22  Q.   Can you --

23        MS. BAGGETT:  To correct the record, because you --

24  Alison, you said "in foster care" and he said "in jail."  Can

25  you correct that question?

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Cross by Plaintiff*

40

1    MS. GREGOIRE:  Yeah.  I'm actually going to pull the

2  report because that's not what it says.

3  Q.   (BY MS. GREGOIRE)  Okay.  And so what he said is he

4  remembered, at some point, Daniel was a patient at Bayview

5  Behavioral Hospital in San Diego.  Then it goes on to say, "He

6  described medication from ages five to 13 of all types.  I was

7  on a cocktail of medications every day.  He remembered being

8  treated with ADHD medications.  The ones that I mentioned to him

9  sounded familiar.  Those were Ritalin and Adderall.  He had also

10  been treated with Prozac and Abilify."

11    Is that what he said to you?

12  A.   I don't have specific dates, but you mentioned Abilify,

13  aripiprazole.  It looks like to me that was November of '22 to

14  January of '23.

15  Q.   So he had no history of antipsychotic medication prior to

16  coming into the prison system; is that correct?

17  A.   I would not say that.  I don't know that.

18  Q.   Okay.  I want to talk to you about the difference, to the

19  extent there is one, between addiction and physiological

20  dependence, because we spoke about this earlier, that addiction

21  in fact does entail a physiological dependence, right?

22  A.   It depends on the level and severity of the use disorder,

23  right?  So I think that's an important distinction is if the

24  brain -- the cortex is physiologically dependent on a substance

25  and, in its absence, has cravings for that substance, it's

1  because the brain pathways have been changed.  So you could say

2  that's physiological.

3  Q.   Okay.  So if a person -- maybe that was a poor turn of

4  phrase.  If a person has a driven craving for a substance, that

5  can be described as a physiological dependence?

6  A.   Yes.  At that point, I believe their substance use disorder

7  would be severe enough that now they have a physiological

8  dependence.

9  Q.   Okay.  And a physiological dependence is when they're --

10 you described it as a craving just a moment ago, but there are

11 consequences to your body when you're not taking the drug; is

12 that right?

13 A.   Yes.

14 Q.   Okay.  And a person who is addicted, that physiological

15 dependence can vary, is it fair to say, how that manifests based

16 upon the substance that they're addicted to?

17 A.   And their own genetics.

18 Q.   And their own genetics?

19 A.   Mm-hmm.

20 Q.   And so alcoholics get DTs?

21 A.   Correct.

22 Q.   Is that an example?

23 A.   That is an example.

24 Q.   What about I burn through just a tremendous amount of

25 coffee and get a headache when I don't have it.  Is that an

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Cross by Plaintiff*

42

1  example of a minor physiological dependence?

2  A.   You bring up a very important example because there is, in

3  the DSM-5, caffeine withdrawal syndrome, but there's not

4  caffeine use disorder.  So --

5  Q.   What does that mean to you?

6  A.   Well, it means that the world uses coffee and tea so much

7  that what's abnormal?  You know, what's normal versus abnormal?

8  But there's no doubt that because there is this syndrome

9  characterized by headaches and other things, that there is some

10  kind of physiological dependence, yes.

11  Q.   Okay.  And, well, just going into the withdrawal symptoms,

12  opioid addicts can be in real trouble due to their physiological

13  dependence; is that right?

14  A.   That's correct.

15  Q.   And you have -- I apologize, Doctor, and I should know this

16  from your CV and I don't.  Have you worked with people who are

17  in recovery?

18  A.   Yes.  I've been a medical director for two different opioid

19  treatment programs.

20  Q.   And those are people who are still -- they've chosen to go

21  into recovery, and they are going to still have to deal with

22  some physiological ramifications of the choice to step away from

23  that drug; is that correct?

24  A.   They're on a medication for -- to aid recovery.

25  Q.   Your people are, but that's not true of all people, is it?

1  A.   No.  But I think that's why it's important to be specific

2  in terms of opioid use disorder -- why do so many people on

3  methadone, for example, still use methamphetamine?

4  Q.   Okay.

5  A.   That is a thing.

6  Q.   And so there's still -- and you can pick really any drug,

7  but it's fair to say -- have you worked with people who are in

8  confinement?

9  A.   Yes.

10  Q.   And they're being taken off that drug right away, right?

11  A.   You're talking about opioids?

12  Q.   I'm talking about methamphetamine.

13  A.   Methamphetamine, yes.

14  Q.   And they're going to suffer some physiological symptoms as

15  a result in most cases, correct?

16  A.   Yes.

17  Q.   And a person who chooses -- an alcoholic who chooses to go

18  to treatment is going to suffer some physiological effects from

19  that decision to abstain from the -- from the substance to which

20  they're addicted?

21  A.   And psychological --

22  Q.   And psychological effects?

23  A.   -- effects as well.  I think that's important to point out.

24  Q.   Yes.  But it is possible -- in other words, it is

25  possible -- someone is not sort of damned if you will if they

1    start using one of these -- if they develop these physiological

2    responses to the ingestion of the drug, it is possible for them

3    to stop using the drug; is that correct?

4    A.   It is possible.

5    Q.   I wanted to talk to you just briefly -- incidentally, I'm

6    going to circle back for just one second.  You -- because you

7    work in substance abuse disorder, is it fair to say that most of

8    your clientele have had some adverse experience that predated

9    their use?  They either had a bad childhood or some other thing

10   that you could say at least made them more susceptible to using

11   the drug?

12   A.   The way I would answer that in terms of the opioid use

13   disorder population is that about half of them actually were

14   prescribed medication for a legitimate medical issue, and they

15   got dependent physiologically on opioids, and they did not have

16   bad childhoods or early problems.  So, for example, a car

17   accident or a construction worker who hurt their back, and then

18   they got prescribed a lot of opioids, and then they get out of

19   control.

20   Q.   And so -- and the Court obviously has its own experience,

21   having dealt with a lot of people who are charged with drug

22   crimes.  But all the people that you work with were initially

23   prescribed the medication before they started using any sort of

24   an opioid?

25   A.   Not all of them.  No.  That's what I was going to say is

1  about half have a severely disrupted family history and were

2  exposed to bad things early in life.

3  Q.   Okay.  So about half of those.  And do you work with any

4  other substance addicted type people beyond opioids or is that

5  sort of your specialty?

6  A.   No.  I work with all types, and I do research now more than

7  clinically.

8  Q.   And so then when you take a step back from opioids and talk

9  about, for example, methamphetamine, another very serious drug,

10 I think you would agree, what about those people?  What

11 percentage of them had some sort of an adverse childhood

12 experience or something that made them more susceptible to drug

13 use?

14 A.   It's tough to put a number on it because you're talking

15 about a small percentage of the total population.  Okay?  So

16 arguably less than one percent of the population.  So if you

17 look at those who have a methamphetamine use disorder and you

18 find out were you diagnosed with attention deficit and

19 hyperactivity disorder early in life, that is common.

20 Q.   Okay.  And there is still -- there is still some choice,

21 even as amongst those groups, I guess so to speak.  In other

22 words, I don't think that you're here today, but I want to

23 clarify.  But I don't think you -- you are not here today to say

24 if you used Adderall and you come off the Adderall, you're going

25 to be a meth addict, that's what's going to happen, right?

1  A.   That would be an extreme statement, yeah.

2  Q.   That would be an overstatement, correct?

3  A.   That would be an overstatement.

4  Q.   And not what you're saying today?

5  A.   It's not what I'm saying, no.

6  Q.   And then there was a line in the supplemental report, which

7  you didn't sign, but I just wanted to check my understanding on

8  that, that said that "The defendant has suffered from psychosis

9  from an altered brain that has continued while he has been

10 incarcerated for five years."  Are you proffering that he's

11 maintained himself in a state of psychosis for the past five

12 years?

13 A.   It has diminished.

14 Q.   Okay.

15 A.   Which is typical of methamphetamine-induced psychosis over

16 years.  We have neuroimaging that shows changing in the brain

17 out to two years after someone has stopped.  Okay?  So what it

18 shows in the neuroimaging is that methamphetamine can change the

19 number of neurons, and it can also increase inflammation in the

20 brain.  That all takes time to heal.  And so when I interviewed

21 him in July, he was gaining insight into the fact that he may

22 have not been experiencing the same reality as everybody else.

23 So he was gaining insight into it.  And the example of that

24 would be that he thought he was doing what God told him to do,

25 but now he says maybe it was Satan.

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*MATTHEW LAYTON / Questions by the Court*

47

1  Q.   Do you believe that he is still undergoing -- that he is --

2  during his time with you, has he exhibited or demonstrated to

3  you that he is psychotic?

4  A.   In very low grade terms because he described, for example,

5  waking up in the morning and thinking these same thoughts, but

6  now being able to, quote, talk himself out of it.  Now, you

7  know, he can say "I don't think those things were real, even

8  though, at the time, I was convinced they were."  And I think

9  that's the result of being incarcerated, not having further meth

10 exposure, and that his brain hopefully is healing.

11 Q.   Okay.

12       MS. GREGOIRE:  Your Honor, may I have one moment to

13 consult with cocounsel?

14       THE COURT:  Yes.

15       MS. GREGOIRE:  Thank you.

16     That's all I have at this time, your Honor.  Thank you.

17     Thank you, Dr. Layton.

18       THE COURT:  Dr. Layton, I had a question.  Where is he

19 getting the methamphetamine?  He's voluntarily going out to get

20 it, isn't he?

21       THE WITNESS:  Well, I think he's following an

22 automatic urge that what we would say now he doesn't have the

23 willpower to stop going to get it.

24       THE COURT:  But he didn't have a job at the time, so

25 where is he getting the methamphetamine?

1    THE WITNESS:  I am not sure how he's getting it,

2  whether he was doing it in trade, whether he had other money

3  sources.

4    THE COURT:  But you -- you would say that that's

5  voluntary conduct on his part to go out and seek methamphetamine

6  to use it?

7    THE WITNESS:  I think that is the rub, really, is that

8  what the experts and what the field is saying is that it's a

9  loss of free will, and he's going compulsively to get it

10  automatically.

11    THE COURT:  All right.  Any redirect?

12    MS. BAGGETT:  No, your Honor.  Thank you.

13    THE COURT:  All right.  You can step down.  Thank you.

14    Do you have any argument, Ms. Baggett?

15    MS. BAGGETT:  Your Honor, just briefly, and I'm happy

16  to submit in writing, too, if you want further sort of legal

17  analysis.

18    But the way that I see this, your Honor, is that there are

19  very, very few cases on this question of, under the Insanity

20  Defense Reform Act, the fact that voluntary intoxication cannot

21  be a defense, and keeping in mind that that act came in 1983 and

22  was signed off on by the American Psychological Association, the

23  very association that Dr. Layton was talking about, now has a

24  completely different perspective on these issues.  And that

25  nearly all of the cases that we have interpreting this idea of

 1  voluntary versus involuntary intoxication, if you look at the

 2  dates on those, your Honor, they're all from the 1970s and '80s,

 3  and in fact, a lot of them actually even predate the act.

 4      So I think that what we are not trying to argue here, your

 5  Honor, and I think the government is going to try to suggest

 6  that there's some kind of slippery slope here that, well, if you

 7  buy this argument that he was so intoxicated, he had no free

 8  will, then you're basically opening the door to everybody who

 9  takes methamphetamine and has psychosis can go out and commit

10  any crime they want and not have culpability.  That's not what

11  we're saying here, your Honor.

12      And as Dr. Layton very succinctly described, that's

13  different.  You know, once you have an adult making those

14  decisions versus someone like Mr. Solis, who the origins of all

15  of this were in his infancy and exposure to methamphetamine

16  involuntarily when he was an infant, and then as a child being

17  prescribed -- you know, as an eight-year-old, nine-year-old, you

18  know, he's not deciding whether he -- and he's in foster care,

19  he's not making a decision over whether he takes prescription

20  medications or not.  That in that circumstance where the origins

21  of the brain defect come about through involuntary exposure to

22  these substances to the point where his brain is then dependent

23  and build to the point where he has such psychosis that he's --

24  you know, the decision over whether to seek out meth, to find

25  money for meth, to literally put it in your mouth is not a

1   product of free will.  That's different than saying, oh,

2   somebody who has a genetic susceptibility to addiction, and then

3   when they're an adult or later in life, decides to take this

4   stuff, we're drawing a line between those two, your Honor, a

5   legal line between those two.

6       And I think to say that we can't use the change in science

7   since the 1980s to help us understand and appreciate that there

8   are differences and that they are biologically based is like

9   saying that we should never have changed our legal perspectives

10  once we discovered DNA.  I mean, it's really sort of, you know,

11  once science gets to a certain point, surely we have to take

12  that into account and to accommodate our understanding of the

13  legal side of this to take that into account.

14      And I think there's -- you know, to say that -- I mean,

15  really we're -- the question before your Honor is, you know, is

16  this a type of case where maybe we want to consider lack of

17  culpability or a difference in culpable level.  That's really

18  the question.

19      And I think if you look at other examples, even in the old

20  case law from the 1980s, of examples where it didn't necessarily

21  come in in cases but are constantly routinely recited as, oh,

22  well, we would agree that this would be allowed if it ever came

23  up.  And those are things like somebody voluntarily takes a

24  drug, and it turns out that it happened to be, like, they had

25  hypersensitivity to it or something or someone slips a drug into

1  your drink, and you don't know about it, and therefore, we

2  would -- might recognize that.  I would say that if you compare

3  the level of culpability of people in those kinds of

4  hypotheticals to the level of culpability of somebody like

5  Mr. Solis, whose brain was so altered and rewired involuntarily

6  throughout his entire childhood, I think that his situation is

7  just as arguable as those types of hypotheticals, your Honor.

8           THE COURT:  All right.  Thank you.

9       Ms. Gregoire, do you have rebuttal?

10          MS. GREGOIRE:  Very briefly.

11      Your Honor, nothing that Dr. Layton said today does

12  anything to disturb the previous findings of this Court, nor

13  does it disturb the previous arguments set forth by the

14  government.

15      What I heard Ms. Baggett arguing essentially is that a lot

16  has changed since 1983, and she elicited as much.  But to

17  suggest that this Court is therefore free to disregard the law

18  because it was established at a different point in time I think

19  completely lacks footing.

20      What we do know is the law is that addiction is not enough.

21  That you are going to suffer an adverse ramification in terms of

22  physiologically or psychologically because you've developed an

23  addiction to the drug, that is not enough to make it

24  involuntary.  And voluntary intoxication cannot serve as the

25  precursor, cannot serve as a basis, cannot serve as a

1   contributing factor to insanity.

2        And, your Honor, in this case, as Dr. Layton testified,

3   there are people who have addictions who do suffer physiological

4   effects, whose brains have been, quote, unquote, rewired such

5   that they are going to suffer effects when they stop the drug.

6   And they go to his treatment program and they come before this

7   Court and they go to jail sometimes, and those people stop

8   using.  There is still a volitional choice to use, as opposed

9   to -- even once one is addicted, there is a volitional choice to

10  use, as opposed to suffering that physiological effect.

11       And, your Honor, the case law is very clear.  An addiction

12  will not serve to take something out of what would be voluntary

13  intoxication and make it involuntary intoxication, and the

14  reasons for that were explained pretty well by Dr. Layton.  At

15  least half of his patients have as a precursor to their -- to

16  what ultimately becomes their substance use that they had a bad

17  childhood.  A good portion of the balance of his patients have

18  as a precursor that they were prescribed a drug that ultimately

19  generated an addiction that they then had to feed.  That does

20  not serve to make all of that voluntary use involuntary because

21  they were going to suffer a physiological effect if they stop.

22       And, your Honor, I believe the case law is clear on this,

23  but I can yield to any questions from the Court.

24            THE COURT:  I have no questions.

25            MS. GREGOIRE:  Thank you, your Honor.

*USA v. Solis / 2:20-cr-00179-TOR-2*
*Pretrial and Motion Hearing / October 31, 2024*
*Ruling by the Court*                                            53

1          THE COURT:  It is the decision of the Court to not

2    allow the insanity defense.  The defendant's use of alcohol or

3    drugs was volitional in this case.

4          I've read all the foster care, and I've read Dr. Layton's

5    written report and heard all his testimony, but I still find

6    under federal law that it's volitional, and using drugs

7    voluntarily -- drugs or alcohol voluntarily does not establish

8    an insanity defense.

9          That's the ruling of the Court.

10          At this time, I need, Ms. Baggett, you and your client to

11    stay in the court.  I'm going to have an ex parte hearing with

12    you on a matter that you filed.  And everyone else is excused

13    from the courtroom.

14          MS. GREGOIRE:  Thank you, your Honor.

15          (Proceedings concluded on October 31, 2024, at 11:28 a.m.)

16

17

18

19

20

21

22

23

24

25

WITNESS INDEX


<u>For the Defense</u>                                                      <u>Page</u>

MATTHEW LAYTON

    Direct Examination by Ms. Baggett                    4

    Cross-Examination by Ms. Gregoire                   32

    Questions by the Court                              47


Closing Argument by Ms. Baggett                          48

Closing Argument by Ms. Gregoire                         51

Ruling by the Court                                      53




EXHIBIT INDEX


<u>Exhibit No.</u>   <u>Description</u>                                   <u>Page</u>

None

55

1                    C E R T I F I C A T E

2

3       I, CRYSTAL L. GONZALEZ, do hereby certify:

4       That I am an Official Court Reporter for the United States

5   District Court for the Eastern District of Washington in

6   Spokane, Washington;

7       That the foregoing proceedings were taken on the date and

8   place as shown on the first page hereto; and

9       That the foregoing proceedings are a full, true, and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12      I do further certify that I am not a relative of, employee

13  of, or counsel for any of said parties, or otherwise interested

14  in the event of said proceedings;

15      DATED this 1st day of November, 2024.

16

17                          _____
                            CRYSTAL L. GONZALEZ, CRR, RPR
18                          Washington CCR No. 2955
                            Official Court Reporter
19                          Spokane, Washington

20

21

22

23

24

25