UNITED STATES OF AMERICA,

Plaintiff,

v.

DANIEL AUGUSTINE SOLIS,

Defendant.

**Government Attachment A**

Government's Response to Defendant's
Motion to Withdraw Guilty Plea

Case No.: 2:20-CR-00179-TOR-2

```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3      _____

 4      UNITED STATES OF AMERICA,

 5                           Plaintiff,
                                             DOCKET NO. 1:20-cr-37
 6      vs.

 7
        DANIEL AUGUSTINE SOLIS,
 8
                             Defendant.
 9      _____/

10

11             TRANSCRIPT OF CHANGE OF PLEA HEARING

12        BEFORE THE HONORABLE ROBERT J. JONKER, CHIEF JUDGE

13                     GRAND RAPIDS, MICHIGAN

14                        June 15, 2020

15

16      Court Reporter:          Glenda Trexler
                                  Official Court Reporter
17                                United States District Court
                                  685 Federal Building
18                                110 Michigan Street, N.W.
                                  Grand Rapids, Michigan 49503
19

20      Proceedings reported by stenotype, transcript produced by

21      computer-aided transcription.

22

23

24

25
```

```
 1    A P P E A R A N C E S:

 2    FOR THE GOVERNMENT:

 3         MR. DANIEL Y. MEKARU
           UNITED STATES ATTORNEY'S OFFICE
 4         330 Ionia Avenue, N.W.
           P.O. Box 208
 5         Grand Rapids, Michigan 49501-0208
           Phone:  (616) 456-2404
 6         Email:  daniel.mekaru@usdoj.gov

 7    FOR THE DEFENDANT:

 8         MS. HELEN C. NIEUWENHUIS
           FEDERAL PUBLIC DEFENDERS OFFICE
 9         50 Louis Street, N.W., Suite 300
           Grand Rapids, Michigan 49503-2633
10         Phone:  (616) 742-7420
           Email:  Helen_nieuwenhuis@fd.org

11

12                   *   *   *   *   *

13                            Grand Rapids, Michigan

14                            June 15, 2020

15                            3:01 p.m.

16              P R O C E E D I N G S

17         THE COURT:  We're here on the case of the

18    United States against Daniel Solis, 1:20-cr-37.  We have an

19    anticipated change of plea.  And let's start with appearances,

20    please.

21         MR. MEKARU:  Good afternoon, Your Honor,

22    Daniel Mekaru on behalf of the United States.  With me today is

23    FBI Special Agent Peter Ellis.

24         THE COURT:  All right.  Thank you.

25         MS. NIEUWENHUIS:  And Helen Nieuwenhuis on behalf of
```

 1   Mr. Solis, Your Honor, and Mr. Solis is here and seated to my

 2   right.

 3          THE COURT:  All right.  And your client's intent is

 4   to enter a plea of guilty today?

 5          MS. NIEUWENHUIS:  That is correct, Your Honor.

 6          THE COURT:  My understanding is there's no plea

 7   agreement, at least in writing; is that right?

 8          MS. NIEUWENHUIS:  Correct.

 9          THE COURT:  Is there anything we should know about

10   any oral commitments of any kind from your perspective,

11   Ms. Nieuwenhuis?

12          MS. NIEUWENHUIS:  None other than I believe that the

13   government is going to agree that this is a timely plea.

14          THE COURT:  All right.  Mr. Mekaru.

15          MR. MEKARU:  That would be fair, Your Honor.  It's

16   not necessarily an agreement, but clearly the circumstances

17   present that this is a timely plea.

18          THE COURT:  Fair enough.  Very good.

19          Mr. Solis, and actually counsel too, if you want to

20   just stay seated where you are, with or without masks, feel

21   free to do that today.  I know it doesn't come naturally, to

22   lawyers especially, to sit down in court, but it's a lot easier

23   to access the microphones, and we're all trying to do this in a

24   way that keeps people as comfortable and safe as possible in

25   COVID days.

```
 1              Mr. Solis, you don't have to proceed with a guilty
 2    plea today.  You don't have to say anything at all.  If you do
 3    want to proceed with a guilty plea, and that's what your lawyer
 4    expects, I'm going to have to have you sworn in, and then I'm
 5    going to have some questions for you that you'll have to answer
 6    under oath subject to penalty of perjury.
 7              Do you have any questions about that?
 8              THE DEFENDANT:  No, Your Honor.
 9              THE COURT:  All right.  We'll have you sworn in.  And
10    you can take the mask off.  You should know I'll be able to
11    hear you even if you want the mask on and you want to speak
12    through it.  So you use your judgment on how you want to
13    proceed with that today.  Okay?
14              THE DEFENDANT:  Okay.
15              THE COURT:  Okay.  Ms. Bourque will swear you in.
16              THE CLERK:  Please raise your right hand.
17                     DANIEL AUGUSTINE SOLIS
18                  (The oath was administered)
19              THE DEFENDANT:  Yes.
20              THE COURT:  All right.  Mr. Solis, how old are you?
21              THE DEFENDANT:  I'm 28 years old.
22              THE COURT:  What city do you consider home?
23              THE DEFENDANT:  Chula Vista, California.
24              THE COURT:  All right.  And what brought you to
25    Michigan?
```

1      **THE DEFENDANT:**  My grandmother has recently been

2   diagnosed with Parkinson's.

3      **THE COURT:**  I'm sorry to hear that.

4      **THE DEFENDANT:**  Yeah, thank you.  And I came here

5   because my cousin that usually helps her out with like the

6   groceries and the chores and stuff, she just moved in with her

7   boyfriend.  And I haven't seen my grandma in over like

8   five years, so I took a break from what I was doing back home

9   and came to visit her and help take care of her a little bit.

10     **THE COURT:**  All right.  Okay.  What had you been

11   doing back in Chula Vista?

12     **THE DEFENDANT:**  I was working at a Navy contracting

13   company called Core Mechanical.  We were doing ventilation

14   maintenance for the vessels so that they could pass their

15   in-serve tests.  And I was traveling around the world doing

16   that, and I ended up moving in with this girl that I lived with

17   for five years and she wanted me to stop traveling, so I quit

18   that job and worked in Chula Vista at a campground.  I was a

19   supervisor at the campground.

20     **THE COURT:**  Okay.  And I take it you went to school

21   in Chula Vista before all of that?

22     **THE DEFENDANT:**  I actually dropped out of school when

23   I was about 15.

24     **THE COURT:**  All right.  What grade were you in at the

25   time?

1    *THE DEFENDANT:* Um, I think it was the beginning of

2 my eleventh-grade year.

3    *THE COURT:* All right. And did you ever finish up a

4 GED or diploma of any kind?

5    *THE DEFENDANT:* I did not, but I did take an entry

6 exam at MiraCosta Community College and I was able to take

7 classes there. I just wasn't able to receive any diplomas

8 above a GED or a high school diploma until I got one of those.

9    *THE COURT:* All right.

10    *THE DEFENDANT:* But I did do a semester there at that

11 community college.

12    *THE COURT:* All right. So you certainly feel you can

13 read at or above a high school level and do math at or above a

14 high school level and all the rest?

15    *THE DEFENDANT:* Yes.

16    *THE COURT:* Why wouldn't you finish that off? What

17 would get in your way of just getting the little piece of paper

18 that says "I can do it"?

19    *THE DEFENDANT:* This is probably going to sound

20 really dumb, but I want to be like a famous rapper, and also I

21 feel like achieving life's goals and being able to almost say

22 that like you did it under like the circumstances that I faced

23 growing up and then not getting a GED or anything like that

24 kind of would show people that like you don't have to be like

25 constrained by your circumstances to succeed, you know.

```
 1            THE COURT:  All right.  So it's --
 2            THE DEFENDANT:  It's kind of silly.
 3            THE COURT:  Well, it's part of the persona you wanted
 4   to create and preserve for yourself.
 5            THE DEFENDANT:  Exactly.
 6            THE COURT:  Okay.  Today you're with your lawyer,
 7   Ms. Nieuwenhuis, and she's been appointed to represent you.
 8   Have you been able to talk with her about this case?
 9            THE DEFENDANT:  Yes, we have.
10            THE COURT:  Has she been able to answer your
11   questions?
12            THE DEFENDANT:  Yes.
13            THE COURT:  Do you need any more time to consult with
14   her before you make your choice?
15            THE DEFENDANT:  No.
16            THE COURT:  Do you feel like you have the information
17   you need?
18            THE DEFENDANT:  Yes.
19            THE COURT:  How long had you been in Michigan, by the
20   way, before -- we'll talk in more detail about what the
21   government charge is here -- but before you were at the
22   J.P. Morgan Bank, according to the government anyway, in
23   February of 2020, how long were you actually in Michigan?
24            THE DEFENDANT:  Um, I think about a month and a half,
25   almost two months maybe.
```

1          THE COURT:  All right.  So not exactly an auspicious

2    stay in Michigan so far.

3          THE DEFENDANT:  No.

4          THE COURT:  All right.  Do you have any questions or

5    concerns about competence, Ms. Nieuwenhuis?

6          MS. NIEUWENHUIS:  I do not, Your Honor.

7          THE COURT:  Mr. Mekaru?

8          MR. MEKARU:  No, Your Honor.

9          THE COURT:  Yeah, I don't either.  Mr. Solis appears

10   fully competent to me.  He's certainly alert, focused, and

11   responsive.  He's intelligent.  You can tell that.  And as far

12   as I'm concerned, he's in a frame of mind and position today to

13   make the decisions that he needs to make.

14          And now I would like to look at that Indictment with

15   you because that's the only information I have about your case,

16   Mr. Solis.  And it's a government charge, and I want to make

17   sure you've been able to go through it with Ms. Nieuwenhuis.

18          You've been able to do that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  If you want to go to trial on this, it is

21   your absolute right.  And if we do that, the government is

22   going to have to prove this to a jury beyond reasonable doubt.

23          Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.  If you want to plead guilty after

1    we go through all this, that's possible too.  Either way,

2    though, the following things are going to have to be true,

3    either because you tell me they are true later or because the

4    government proves them to a jury.  There's going to have to be

5    a showing that back in February of this year in

6    Kalamazoo County, Michigan, you were at that J.P. Morgan Chase

7    Bank and took money from the presence of another human being,

8    not just out of an ATM but from the presence of another human

9    being; that when you did that the money was in the custody of a

10   bank or an institution insured by the federal government, the

11   FDIC in this case; and that you got the money from the presence

12   of the other person by something the law would consider

13   intimidation.  It doesn't necessarily mean you were nasty or

14   unruly or vicious but something that a person, like a teller,

15   would interpret it as "Give me the money or else."  That kind

16   of a thing.  There had to be some physical attempt to get that

17   money from the bank.

18          Those would have to be true or proven by the

19   government beyond a reasonable doubt if we went to trial.

20          Do you have any questions about those things?

21          *THE DEFENDANT:*  No.

22          *THE COURT:*  Okay.  If you are convicted, either

23   because we go to trial and you lose or because you plead guilty

24   today and I accept it, either way, if you're convicted, the

25   Court is going to have to think about and impose penalties, and

```
 1    that could include imprisonment in this case for anywhere from
 2    nothing to as much as 20 years.
 3              Do you understand that?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  There's also something called supervision
 6    the Court has to consider.  It's a period of time that follows
 7    imprisonment where you're back in your community and you live
 8    in the community on rules that the Court sets.  If you break
 9    the rules, the Court can send you to prison for that, even if
10    you don't commit a new crime in the process.  And you could be
11    on supervision like that for up to three years following any
12    imprisonment.
13              Any questions about that?
14              THE DEFENDANT:  No.
15              THE COURT:  There is a series of financial penalties
16    that you face if you're convicted.  One is a special
17    assessment.  It's automatically added to every felony judgment
18    in federal court, so you'd get a $100 special assessment.  The
19    Court would have to consider a fine.  The fine is in the
20    Court's discretion.  It could be anywhere from nothing to as
21    much as $250,000.  And finally the Court would impose
22    restitution.  Basically an order that you give back to the
23    victim, the bank in this case, whatever you wrongfully got.
24    And according to the government's Indictment at least, that
25    would be $7,038.50.  So those would be the financial penalties
```

1     you'd face.

2              Any questions about that?

3              *THE DEFENDANT:*  No, Your Honor.

4              *THE COURT:*  Okay.  Now, those are pretty wide ranges,

5     especially when you think imprisonment.  You know, zero to

6     20 years for anybody is a pretty wide range, especially when

7     you're just 28 years old.  And you won't get a range of

8     punishment at sentencing.  If you go ahead with this, you'll

9     get a specific period of imprisonment.  And in deciding what

10    that should be within the range, the Court will begin by

11    calculating sentencing guidelines.

12             Have you been able to talk with Ms. Nieuwenhuis about

13    that?

14             *THE DEFENDANT:*  Yes, Your Honor.

15             *THE COURT:*  Do you have any questions about it for me

16    today?

17             *THE DEFENDANT:*  No, Your Honor.

18             *THE COURT:*  There's nothing that I can guarantee you

19    today on the guidelines, nothing that Ms. Nieuwenhuis can

20    guarantee you, nothing that Mr. Mekaru can, because none of us

21    know for sure what your final guideline range will be.

22             Do you understand that?

23             *THE DEFENDANT:*  Yes, Your Honor.

24             *THE COURT:*  Okay.  Let me talk about the process I'll

25    use in walking through the guidelines, make sure you and

1  Ms. Nieuwenhuis have covered these topics, because the process
2  I can tell you about.
3          I'm going to come up with two numbers, one called
4  level of offense, one called criminal history category.
5          Have you been able to talk to your lawyer about
6  those?
7          THE DEFENDANT:  Yes, Your Honor.
8          THE COURT:  Criminal history category will require me
9  to find out if you have a criminal record.  If you do, I'll
10  find out what you've been convicted of, when, and what the
11  sentences were.  And depending on all that, there will be a
12  score, a criminal history score.  There's a category that lines
13  up with the score.  I is the lowest and VI is the highest.  And
14  I'm going to be figuring out what category you fit into.
15          Have you been able to go through that with
16  Ms. Nieuwenhuis?
17          THE DEFENDANT:  Yes, Your Honor.
18          THE COURT:  On level of offense I'm trying to get
19  something else.  I'm trying to get a comparison for how serious
20  this criminal activity is when compared to other federal
21  criminal activity.
22          So every crime in the criminal system has a base
23  level, a starting point, and that includes this kind of an
24  offense.  A bank robbery offense has a starting point.  Then
25  there will be some factors that aggravate or add to the

 1    seriousness and some that subtract or reduce the seriousness,

 2    like timely acceptance of responsibility which you heard the

 3    lawyers talking about at the beginning of this hearing.

 4            I'm going to look at all the factors and just do the

 5    math.  Start with the base, add anything that's aggravating,

 6    subtract anything under the guidelines in your favor, and come

 7    up with a final level of offense.

 8            Again, have you been able to go through that with

 9    Ms. Nieuwenhuis?

10            THE DEFENDANT:  Yes, Your Honor.

11            THE COURT:  I'll get the final level of offense and

12    the criminal history category and put it on a single-page chart

13    called the guideline chart.  Where those things come together,

14    I have a sentencing or a guideline sentencing range in months

15    of imprisonment with a low end and a high end.

16            Have you gone through that chart with your lawyer?

17            THE DEFENDANT:  Yes, Your Honor.

18            THE COURT:  Do you have any questions about it for

19    me?

20            THE DEFENDANT:  No, Your Honor.

21            THE COURT:  I want to shift -- well, one more thing I

22    need to talk about on sentencing.  So the guideline range is

23    important.  It's a starting point.  Starting points are always

24    important.  But it's not the ending point.  When it comes to

25    what the actual sentence should be in your case or any other,

1    I'm still going to have to consider you individually, good and

2    bad in your 28 years, and then the general purposes of every

3    sentencing.  What's needed, for example, to encourage other

4    members of the public not to do what you did.  What's needed to

5    encourage you not to do it again.  How do I reflect the

6    seriousness of what happened here in the sentence?  Those kinds

7    of factors can lead me to go either higher or lower than the

8    guideline range if I think there's a good reason to do it.

9         Do you feel like you and Ms. Nieuwenhuis have been

10   able to walk through those kinds of things and how they might

11   affect your sentence?

12        THE DEFENDANT:  Yes, Your Honor.

13        THE COURT:  Okay.  Any questions for me at all about

14   how I'll approach sentencing if you go ahead with this?

15        THE DEFENDANT:  No, Your Honor.

16        THE COURT:  All right.  Let me shift to a totally

17   different topic, then, and spend some time getting a little

18   more detailed about the bundle of rights you have today and

19   that you'll give up if you plead guilty and won't get back in

20   this case.  Because fundamentally that's the presumption of

21   innocence which protects you now.  Which means that in the eyes

22   of the law you'll stay that way, presumed innocent, unless and

23   until the government can prove this case to a jury beyond

24   reasonable doubt.  If you do plead guilty, you'll give up your

25   right to go to jury trial and you won't be able to get it back

1  in this case.

2          Do you understand that?

3          *THE DEFENDANT:*  Yes, Your Honor.

4          *THE COURT:*  Okay.  Have you ever been through a trial

5  before?

6          *THE DEFENDANT:*  No, Your Honor.

7          *THE COURT:*  Okay.  Someday, whether you become a

8  rapper in your image or not, you need to go through a trial.

9  Not necessarily your own.  But you need to see how that

10 unfolds.  And if it did unfold in this case for you, we'd start

11 it like any other trial by picking a jury of 12 people.  They

12 would be from the district we're in, the Western District of

13 Michigan, and that's the group that would decide your case.

14         The government is the only party at a trial that has

15 a burden of proof.  It's to prove whatever it's charged you

16 with beyond a reasonable doubt.  And to do that the government

17 has to bring real evidence to court.  It can't just rely on the

18 words of Mr. Mekaru or some other government lawyer.  Witnesses

19 need to come, they are sworn in, they testify publicly and in

20 your presence, subject to your lawyer's cross-examination.  And

21 any other evidence the government has to present it needs to do

22 it the same way, publicly and in your presence.  Using just

23 that evidence, the government would have to convince all 12

24 members of the jury that you're guilty beyond a reasonable

25 doubt.  All of them would have to agree on that before you

1    could be convicted and subjected to the penalties we just

2    talked about.  Today, though, if you plead guilty, you'll give

3    up that bundle of rights and won't be able to get them back in

4    this case.

5                Do you have any questions about that?

6                *THE DEFENDANT:*  No, Your Honor.

7                *THE COURT:*  At the defense side of a trial things are

8    very different.  There's no burden of proof in the eyes of the

9    law.  You don't have to say, do, present, prove anything.  You

10   can just rest on the presumption of innocence.  And if that's

11   what you want to do, I would instruct the jury repeatedly that

12   it cannot in any way hold it against you in deciding whether

13   the government proved its case.

14               You would not have to just rest on the presumption of

15   innocence, though.  If you wanted to, you could present your

16   own evidence, calling witnesses, using the power of this Court

17   to get your witnesses here if you needed help with that.  You

18   could testify for yourself if you wanted to.  And with your

19   lawyer's help you could present any other evidence that you

20   think would help defend this charge.  And once again, today if

21   you plead guilty, you'll give those things up and won't get

22   them back in this case.

23               Do you have any questions about that?

24               *THE DEFENDANT:*  No, Your Honor.

25               *THE COURT:*  One right you have today that you won't

1   give up no matter what is your right to counsel.

2   Ms. Nieuwenhuis is here with you today.  She'll stay with you

3   for the rest of this hearing and come back and represent you at

4   sentencing if you go ahead with a guilty plea.  But if you want

5   to go to trial, you won't lose Ms. Nieuwenhuis.  She will still

6   be your lawyer, and she will go with you to trial and represent

7   you there on the same basis she is right now.

8          Do you have any questions about that?

9          *THE DEFENDANT:*  No, Your Honor.

10         *THE COURT:*  All right.  I asked the lawyers right at

11  the beginning of this if there was any kind of plea agreement.

12  They said there isn't.  And then they said at Ms. Nieuwenhuis's

13  urging, "Well, I think the government agrees that this is a

14  timely plea," which references for lawyers and judges a

15  guideline issue.  If you take acceptance of responsibility by

16  pleading guilty, normally for guidelines the Court can credit

17  you two points.  If you do it in a way that's early enough for

18  the government to avoid all the work it has to do to prepare a

19  case for trial, you can get an extra point off.  And what I

20  understood the lawyers are telling me is they agree if you

21  plead guilty today, this would be timely even though we're

22  right on the eve of final pretrial conference.

23         Do you have any questions about that?

24         *THE DEFENDANT:*  No, Your Honor.

25         *THE COURT:*  And you understand from talking with your

1    lawyer that the third point as I called it is one of the things

2    you'd get if you complete the plea today?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Okay.  Other than that, has the

5    government made any other promises or commitments to you to get

6    you to plead guilty today, Mr. Solis?

7              THE DEFENDANT:  No, Your Honor.

8              THE COURT:  Do you feel like anybody at all has done

9    that, whether they are from the government or someplace else?

10              THE DEFENDANT:  No, Your Honor.

11              THE COURT:  Do you feel like anybody has tried to

12    pressure you or push you into this against your will?

13              THE DEFENDANT:  No, Your Honor.

14              THE COURT:  I think you said your grandma is the

15    person who brought you here with a recent Parkinson's

16    diagnosis.  Is she still able to talk and communicate?

17              THE DEFENDANT:  Yes.

18              THE COURT:  Have you been able to talk with her about

19    this?

20              THE DEFENDANT:  Yes.

21              THE COURT:  I'm sure neither one of you hoped for or

22    envisioned this when you came to Michigan, but you've been able

23    to stay in touch at some level?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  Okay.  Do you have any questions for me?

```
 1              THE DEFENDANT:  No, Your Honor.
 2              THE COURT:  Ms. Nieuwenhuis, anything else you want
 3    me to explore?
 4              MS. NIEUWENHUIS:  No, Your Honor.
 5              THE COURT:  Mr. Mekaru, anything else?
 6              MR. MEKARU:  No, Your Honor.
 7              THE COURT:  All right.  Mr. Solis, I'm going to go
 8    back to that charging document, the Indictment, that charges
 9    you with bank robbery in Kalamazoo County in February of this
10    year and ask you how you plead, guilty or not guilty?
11              THE DEFENDANT:  Guilty, Your Honor.
12              THE COURT:  It's a decision you make strictly of your
13    own free will?
14              THE DEFENDANT:  Yes, Your Honor.
15              THE COURT:  You understand if I accept it in a
16    minute, you're going to be judged guilty today of this federal
17    offense?
18              THE DEFENDANT:  Yes, Your Honor.
19              THE COURT:  And that will mean the only thing left to
20    do in your case is sentencing on a later date.  Do you
21    understand that?
22              THE DEFENDANT:  Yes, Your Honor.
23              THE COURT:  Sentencing can include imprisonment for
24    anywhere from zero up to 20 years.
25              Do you understand that too?
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And do you feel ready to take on that

3    risk today?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Okay.  I do believe that Mr. Solis is

6    tendering a plea of guilty that's proper in all respects.  I

7    think he is certainly doing it voluntarily.  I think he's doing

8    it with full information and understanding about the rights he

9    has and is giving up.  What he's getting as well.  About the

10   comparative risks of going forward to trial or proceeding today

11   with a plea.  I'm satisfied he's made that choice based only on

12   his own freewill judgment about what's best for him.  I don't

13   see any indication of threats, coercion, or other improper

14   influence.  And I don't see any indication of undisclosed

15   promises.  So the tender of the plea is proper.

16          Leaving only the question of what happened.  You

17   remember being in Kalamazoo back in February, I take it?

18          THE DEFENDANT:  Yes, February 12th, I believe.

19          THE COURT:  All right.  And did you in fact go to the

20   J.P. Morgan Chase Bank at that point?

21          THE DEFENDANT:  Yes, I did.

22          THE COURT:  Okay.  What happened when you went to the

23   bank?

24          THE DEFENDANT:  I went in, there was two people in

25   front of me doing a transaction with the teller, so I waited.

1    When I got -- it was my turn, I got up to the front, I passed a

2    demand note demanding $50,000 from the bank and some other

3    instructions in there.  And the teller gave me seven grand

4    roughly, and I put the money in my backpack and I left the

5    bank.

6             THE COURT:  All right.  Was there a threat on the

7    note or did it just say "Please give me $50,000"?

8             THE DEFENDANT:  Yeah, there was no threat on the

9    note.  It said, "Give me $50,000."  And I think there was

10   instructions for the money to be like spendable and like

11   unmarked.  And also I requested that the teller not alert

12   anybody about the transaction.

13            THE COURT:  All right.  So it's February in Michigan,

14   and unlike Chula Vista, California, it's usually cold in

15   February.  Were you masked up?  Hats?  How were you dressed?

16            THE DEFENDANT:  No mask.  I was just wearing what I

17   would usually wear on a regular day.

18            THE COURT:  Okay.

19            THE DEFENDANT:  I had a coat, a jacket on, I think.

20            THE COURT:  Did you think they would just hand it to

21   you?  I mean, what kind of an impression or persona did you try

22   to convey to the teller to get money, 50,000 bucks' worth?

23            THE DEFENDANT:  I had actually heard from a friend of

24   mine, his sister is a bank teller, and she had told me years

25   and years ago she had a job interview at a bank and she was

1  being like trained or something and they had told her that if

2  someone gives them a note, like it really doesn't matter what

3  the note says, like they are kind of just instructed to just do

4  what the note says.  And I forgot what it was, I think I was

5  watching a commercial on TV about a bank or something like that

6  and I remembered what she had said, and I think out of just

7  really, really, really dumb curiosity I went in to try and see

8  if you could actually get money doing that from a bank.  And

9  sure enough -- when I was giving the guy the note, I wasn't

10  sure what to expect.  If he was going to, you know, tell me to

11  leave, like look at me dumb and tell me to get out of the bank.

12  Or I wasn't sure what to expect.  And when he gave me the

13  money, I kind of thought to myself like "Wait a minute, like

14  maybe I should just give it back to him," but then also I was

15  kind of excited about having that much money, so I left with

16  it, and then sure enough . . .

17          THE COURT:  All right.  Okay.  How did you settle on

18  50,000 to put in the note?

19          THE DEFENDANT:  Um, it seemed like a reasonable

20  number for me to be satisfied with, I guess.  I thought --

21  because my expectation was if I was going to get money from the

22  bank, you know, 50,000 was -- is a lot of money.  So I thought

23  maybe -- I was -- just a random number kind of.  I thought

24  maybe more than 50,000.  I don't know how much money banks hold

25  at one time, so . . .

1        *THE COURT:* All right. And did you pick J.P. Morgan

2 just because it was close to where you were or was there some

3 other reason for that?

4        *THE DEFENDANT:* Well, this is actually kind of an

5 interesting story as well. I had at one time emailed the board

6 of Chase Bank along with the director of Chase Bank, and I had

7 sent them an email kind of asking them about like faith in God

8 because they had sent me an offer in the mail for a credit card

9 and the advertisement for the credit card said -- said

10 something very, very similar to a Bible verse that I was

11 familiar with, so I was wondering if it was like related,

12 you know. And I know on money it says "In God we -- or in God

13 we trust." On money it says that. So I thought like if there

14 was a correlation between God, faith, and, you know, money.

15        So I had sent -- I think his name was Jamie Dimon --

16 and the other board members of Chase Bank an email referring to

17 a question about that, and his secretary called me back and

18 left a voicemail on my cell phone and told me to contact her.

19 So I contacted his secretary, and we talked a little bit about

20 my question, and she said that the bank actually wasn't allowed

21 to discuss religious points of view, which was the ultimate

22 answer to my question, but then she also said like, "Hey, also,

23 are you surprised that we actually are, you know, contacting

24 you about your question?" And I told her like, "Yeah,

25 you know, it's very surprising that you guys actually took the

 1   time to reach back out to me."  Then she said, "Well, hey,

 2   you know, if you have any other questions or need help with

 3   anything or anything like that, give me a call and I'll see

 4   what I can do for you."  So I think I picked Chase Bank just

 5   based on my very small relationship with them.

 6            THE COURT:  All right.  Probably not the way they had

 7   in mind for you to reach out and touch them, right?

 8            THE DEFENDANT:  Not at all.

 9            THE COURT:  All right. Mr. Mekaru, anything else you

10   want on the plea?  And obviously intimidation is a legal

11   matter, can run the gamut from very threatening behavior to

12   less threatening behavior, and we just had a sentencing

13   involving that, but are you satisfied that the intimidation

14   element is met here as well as the jurisdictional element?

15            MR. MEKARU:  Your Honor, I do actually have a copy of

16   the note that was recovered.

17            THE COURT:  All right.

18            MR. MEKARU:  I can read it.  It was largely similar

19   to what Mr. Solis had just described to you.  It reads "Give me

20   $50,000 unmarked, untraced, no exploding ink.  Spendable

21   dollars in $100 bills.  Do not alert anyone.  Do not tell

22   anyone this happened."

23            THE COURT:  All right.  And so that would fall within

24   the case law on intimidation certainly?

25            MR. MEKARU:  Yes, Your Honor.

1        THE COURT:  Okay.  And jurisdictional element, can

2   you just proffer that?

3        MR. MEKARU:  Yes, Your Honor.  Chase Bank is in fact

4   and was in fact insured by the FDIC.

5        THE COURT:  Okay.  Satisfied with the overall factual

6   basis?

7        MR. MEKARU:  I am, Your Honor.

8        THE COURT:  And, Ms. Nieuwenhuis, you as well?

9        MS. NIEUWENHUIS:  I am, Your Honor, yes.

10       THE COURT:  I am too.  I think from what Mr. Solis

11  has indicated, there is a factual basis to support the plea,

12  and so with that and the earlier findings of the Court, I will

13  accept your plea of guilty to the charge.  That means you're

14  judged guilty of the bank robbery offense, leaving only the

15  question of sentencing.

16       Between now and the sentencing date that we'll get

17  from Ms. Bourque in a minute, a probation officer of the court

18  is going to prepare a written summary.  It's going to go into

19  more detail about what happened.  It will go into more detail

20  about you and your history.  It will include a guideline

21  calculation and a sentencing recommendation.  And eventually it

22  will come to me.  Before I get it, though, it will go to you

23  and your lawyer, so please go through it carefully.  If you

24  think there needs to be more context for something, like the

25  kinds of things you were telling me about a little while ago,

1    or if you think something is just wrong or missing, make sure

2    you talk to your lawyer about that, because when I get the

3    document I want it to be as accurate as possible for sentencing

4    purposes.  If there's something you just can't come to terms

5    with between you, your lawyer, the government lawyer, and

6    probation, you can bring an issue like that to sentencing.

7    Flag the disagreement.  I'll resolve things like that,

8    objections or disagreements, at sentencing.  I'll hear from you

9    if you'd like to speak.  Any victim of the offense, so the

10   teller across the bar of the bank, that person will be invited

11   to speak, though they don't always do it.  I'll hear from the

12   lawyers.  And only after all of that is a matter of record will

13   the Court actually impose sentence.  So that's what's left to

14   do in your case.

15            Do you have any questions about that?

16            THE DEFENDANT:  No, Your Honor.

17            THE COURT:  Okay.  Do we have a sentencing date we

18   can leave with the parties?

19            THE CLERK:  September 18th at 3:00.

20            THE COURT:  Okay.  Mr. Mekaru, anything else today?

21            MR. MEKARU:  No, Your Honor.  Thank you.

22            THE COURT:  Ms. Nieuwenhuis?

23            MS. NIEUWENHUIS:  No, Your Honor.

24            THE COURT:  Okay.  Anything else, Mr. Solis?

25            THE DEFENDANT:  No, Your Honor.

1          THE COURT: All right.  We'll see you all in

2    September.

3          THE CLERK:  Court is in recess.

4      (Proceeding concluded at 3:30 PM)

5                     *   *   *   *   *

6          I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8          I further certify that the transcript fees and format

9    comply with those prescribed by the court and the Judicial

10   Conference of the United States.

11

12   Date:  September 5, 2024

13

14                          **/s/ Glenda Trexler**

15                          _____
                            Glenda Trexler, CSR-1436, RPR, CRR

16

17

18

19

20

21

22

23

24

25